IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| DAIN R. MURPHY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 2:11-CV-114-RWS |
| GILMER COUNTY, GEORGIA, | : | |
| and MARK CHASTAIN, in his | : | |
| individual capacity, | : | |
| | : | |
| Defendants. | : | |

## ORDER

This case comes before the Court on Defendant Gilmer County's Motion

for Summary Judgment [75] and Defendant Chastain's Motion for Partial

Summary Judgment [77].  After reviewing the record, the Court enters the

following Order.

## Background

At all times relevant to this lawsuit, Plaintiff was employed at the Gilmer

County courthouse as Building Maintenance Supervisor.[1]  Plaintiff's

maintenance responsibilities involved maintaining the courthouse and other

---

[1] Unless otherwise noted, the facts are undisputed and are taken from
Defendant Gilmer County's Statement of Material Facts Upon Which there Exists No
Genuine Issue to be Tried ("Gilmer's SMF"), Dkt. [73-3].

county structures.  Among Plaintiff's duties were trash removal, carpentry, grounds, pest control, electrical, plumbing, HVAC maintenance, and fire prevention. (Plaintiff's Statement of Material Facts ("Pl.'s SMF"), Dkt. [95-4] ¶ 4.)  As Building Maintenance Supervisor, Plaintiff supervised six janitorial and maintenance employees.  Plaintiff was under the supervision of Defendant Chastain, Chairman of the Gilmer County Board of Commissioners.  Chastain served as Chairman throughout 2009 and 2010.

On multiple occasions, Chastain carried a gun on his ankle into the courthouse.  (Id. ¶ 15.)  Chastain's office is connected to the courthouse, but can be accessed by a separate entrance without going through courthouse security.  (Id. ¶ 20.)  When Chastain did go through the secured entrance to the courthouse, he was allowed to bypass the metal detector.  (Id. ¶ 21.)  Chastain kept a second gun in his desk drawer until the spring of 2010.  (Id. ¶ 15.)

There are signs posted in the courthouse prohibiting firearms.  (Id. ¶ 22.) However, in February 2009, Chastain asked Plaintiff to contact the Sheriff's Office to see if Chastain could permissibly carry a firearm in the courthouse. This is when Plaintiff learned that Chastain carried a gun.  (Id. ¶ 23.)  Plaintiff contacted Captain Leeman Henry at the Sheriff's Office who informed Plaintiff

AO 72A
(Rev.8/82)

that Chastain was not allowed to carry a firearm in the secured areas of the courthouse, but could carry his gun into the Commissioner's Office through the separate entrance. (Id. ¶ 25.)  Plaintiff relayed this information to Chastain.  (Id. ¶ 26.)  Chastain then lifted his pant leg, showed Plaintiff the handgun strapped to his ankle, and said "it's his courthouse, that he will do what he wants to do." (Id. ¶ 27.)

In August 2009, Chastain called and asked Plaintiff to come to his office. (Id. ¶ 28.)  When Plaintiff entered Chastain's office, Chastain stood up, opened his desk drawer, pulled out a gun, pointed it in Plaintiff's direction, and asked, "What do you want?  What are you doing here?"  (Id. ¶ 29.)  Later in August 2009, Plaintiff learned from three of his female employees that Chastain had also pulled a gun on them when they walked into Chastain's office to clean. (Id. ¶ 32.)

In October 2009, Chastain again summoned Plaintiff to his office.  This time, when Plaintiff entered, Chastain stood behind his desk, opened his desk drawer, and partially raised the gun.  He challenged Plaintiff to reach him before he could pull out the gun.  (Id. ¶¶ 34-35.)  In November 2009, in the presence of Plaintiff and another gentleman, Chastain pulled the gun out of his

desk drawer and pointed it at his own head, saying "he could take care of the problem."  (Id. ¶¶ 37-38.)  In December 2009, Chastain called Plaintiff to his office and again challenged him to try to get to the gun first.  (Id. ¶ 41.) Following the December 2009 incident, Plaintiff never went into Chastain's office alone again.  (Id. ¶ 44.)

Chastain verbally threatened Plaintiff on several occasions.  He warned Plaintiff, "Take care of it or I'll shoot you."  He also said, "If you can't do the work, I'm just going to have to shoot you."  And, "Don't worry, I'm not going to fire you.  I'm going to shoot you, and then I'm going to fire you."  (Id. ¶ 42.) Chastain admits that he did pull his gun out of his desk drawer when he was talking to employees, including Plaintiff.  (Id. ¶¶ 47-48.)  In February 2010, Naomi Hernandez, one of Plaintiff's employees, came to Plaintiff distraught and crying, and said that she "should not have to work under conditions like this" (referring to Chastain's brandishing of a gun in her presence). (Id. ¶ 59.)

Plaintiff states that he spoke with Captain Henry numerous times about Chastain's actions.  He states that he went to Captain Henry with his concerns in August 2009, in December 2009, on March 2, 2010, and on March 8, 2010. (Id. ¶ 49.)  However, there is no allegation or evidence that Chastain, the sole

AO 72A
(Rev.8/82)

decision-maker regarding Plaintiff's termination, was ever aware of Plaintiff's 2009 complaints or the March 8, 2010 complaint.  (Defendant Gilmer County's Response to Plaintiff's Statement of Material Facts ("Gilmer Resp. to Pl.'s SMF"), Dkt. [100] ¶ 49.)  Therefore, the sole report at issue is the one made on March 2, 2010.

In February 2010, Plaintiff sought counsel from attorney Josie Alexander of the firm Alexander & Associates concerning Chastain's actions.  In his deposition, Plaintiff stated: "my intention at the time was paying her with my [department's ]budget [for legal services] because this was work related and I was trying to understand what my role is, what I am supposed to do, not supposed to do.  I needed help.  I was in way over my head.  So I contacted her."  (Deposition of Dain R. Murphy, Nov. 15, 2011 ("Pl.'s Depo."), Dkt. [90] 97:25-98:4.) At his attorney's request, Plaintiff prepared a "summation of events concerning my interactions with Commissioner Mark Chastain" ([75-1] at 2).  The statement is dated March 3, 2010.

On March 2, 2010, Plaintiff contacted Captain Henry to inform him that he may receive a phone call from Ms. Alexander to clarify certain facts regarding Chastain's actions.  Captain Henry requested that Plaintiff provide

AO 72A
(Rev.8/82)

him with a copy of any written statements Plaintiff had prepared.  Upon

reviewing a draft of Plaintiff's March 3 statement prepared for Ms. Alexander,

Captain Henry informed Plaintiff that we was obligated to report Plaintiff's

allegations to the Sheriff.  Plaintiff responded, "you do what you feel you need

to do."  At some point, the Sheriff's Office passed the report on to the Georgia

Bureau of Investigation ("GBI").  Within two weeks of March 2, Plaintiff was

interviewed by GBI Investigator Dustin Hamby.  (Pl.'s SMF, Dkt. [95-4] ¶ 74.)

On March 17, Agent Hamby interviewed Chastain.  This was the first

time Chastain learned that Plaintiff had articulated any complaints against him

regarding his use or possession of a firearm.  During the interview, Chastain

admitted that he pulled "his gun out of his drawer in front of individuals

approximately six to eight times."  (Id. ¶ 78.)  In late March 2010, Chastain

shared with the County's HR Director, Diana Buttram, that he was being

investigated by GBI for pointing his gun at Plaintiff in the workplace.  (Id. ¶

82.)

On or around April 28, 2010, Plaintiff sent a formal grievance to HR

Director Buttram regarding Chastain's alleged acts ([75-1] at 5).  The grievance

was prepared by Plaintiff and his attorney on April 22, 2012.  This was the first

6

complaint by Plaintiff brought to the attention of the County's HR department. Buttram testified that she read the grievance on April 30.  The grievance requested an investigation into Chastain's possession of a firearm and his brandishing of a firearm in the workplace.   In the grievance, Plaintiff complained that Chastain's actions were interfering with his job.  On April 28, 2010, Chastain received a letter from Plaintiff informing him of Plaintiff's HR grievance ([75-1] at 21-22).  On May 3, 2010, Buttram informed Plaintiff that she had received his grievance.  (Pl.'s SMF, Dkt. [95-4] ¶ 88.)  Buttram and Plaintiff met on May 10, 2010, but instead of discussing Plaintiff's grievance, Buttram informed Plaintiff that his position was being eliminated as part of a reduction in force.  (Id. ¶ 110.)

## Discussion

### I.    Legal Standard - Summary Judgment

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "The moving party bears 'the initial responsibility of informing the . . . court of the basis for

its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257  (1986).

The applicable substantive law identifies which facts are material.  Id. at 248.  A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law.  Id.  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

Finally, in resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002).  But, the court is bound only to draw those inferences which

AO 72A
(Rev.8/82)

are reasonable.  "Where the record taken as a whole could not lead a rational

trier of fact to find for the non-moving party, there is no genuine issue for trial."

Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

"If the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations

omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met

its burden under Rule 56(a), the nonmoving party "must do more than simply

show there is some metaphysical doubt as to the material facts").

## II.   Analysis

### A.    First Amendment Retaliation Claim (Count I)

Defendants[2] argue that Plaintiff's speech cannot give rise to a cognizable

First Amendment retaliation claim because Plaintiff spoke as an employee and

his speech did not touch upon a matter of public concern. (Defendant Gilmer

County's Motion for Summary Judgment ("Gilmer MSJ"), Dkt. [75] at 6).  The

Court agrees with Defendants.

---

[2] Defendant Chastain adopts and incorporates Gilmer County's arguments in support of its motion for summary judgment regarding Plaintiff's First Amendment retaliation claim.  (Defendant Chastain's Motion for Partial Summary Judgment, Dkt. [77] at 13.)

To bring a First Amendment retaliation claim, a public employee must

show:

> (1) the employee's speech is on a matter of public
> concern; (2) the employee's First Amendment interest
> in engaging in the speech outweighs the employer's
> interest in prohibiting the speech to promote the
> efficiency of the public services it performs through
> its employees; and (3) the employee's speech played a
> "substantial part" in the employer's decision to
> demote or discharge the employee.

Anderson v. Burke Cnty., Ga., 239 F.3d 1216, 1219 (11th Cir. 2001).  Once the

employee shows these factors, "the burden then shifts to the employer to show,

by a preponderance of the evidence, that 'it would have reached the same

decision ... even in the absence of the protected conduct.'"  Id. (quoting Mt.

Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977).

However, before a court even reaches this analysis, public employees

must make two preliminary showings.  See Garcetti v. Ceballos, 547 U.S. 410

(2006); Boyce v. Andrew, 510 F.3d 1333 (11th Cir. 2007).  At the outset, the

Court must determine: (1) if Plaintiff spoke as an employee or as a citizen; and

(2) "if the speech addressed an issue relating to the mission of [Plaintiff's]

government employer or a matter of public concern."  Boyce, 510 F.3d at 1342

(citing D'Angelo v. School Bd. of Polk Cnty., Fla., 497 F.3d 1203, 1209 (11th

10

Cir. 2007)).  If Plaintiff was speaking as an employee, "there can be no First

Amendment issue, and the constitutional inquiry ends . . . ."  Id. at 1343.

    To determine whether Plaintiff was speaking as a public employee or as a

citizen, the relevant inquiry is whether the speech "owes its existence to

[Plaintiff's] professional responsibilities."  Garcetti, 547 U.S. at 421-22.  The

inquiry is a pragmatic one; an employee's formal job description is not

determinative.  Id. at 424-25.  "The 'controlling factor' is whether the

expressions are made as an employee fulfilling his responsibility to his

employer."  Springer v. City of Atlanta, Ga., 2006 WL 2246188 (N.D. Ga. Aug.

4, 2006) (quoting Garcetti, 547 U.S. at 1960.)  It does not matter whether

Plaintiff was acting outside of his "day-to-day" duties or his "expected" duties

when he spoke; he "must be able to show that his speech did not rest within the

foreseeable scope of duties he was expected to perform on behalf of his

employer."  Schuster v. Henry Cnty., Ga., 2007 WL 1701795, at *4 (N.D. Ga.

June 7, 2007); accord Khan v. Fernandez-Rundle, 287 Fed. App'x 50 (11th Cir.

2007), and Springer v. City of Atlanta, Ga., 2006 WL 2246188 (N.D. Ga. Aug.

4, 2006).

11

Regarding the second prong, "an employee's speech is an issue of public concern if the speech is 'relating to any matter of political, social, or other concern to the community.'" <u>Barthlow v. Jett</u>, 2008 WL 1985405, at *7 (M.D. Fla. May 2, 2008) (quoting <u>Connick v. Myers</u>, 461 U.S. 138, 146 (1983)). "Whether a government employee's speech 'relates to his or her job as opposed to an issue of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record.'" <u>Watts v. Bibb Cnty., Ga.</u>, 2010 WL 3937397, at *17 (M.D. Ga. Sept. 30, 2010) (quoting <u>Boyce</u>, 510 F.3d at 1343). "Because an employee's speech 'will rarely be entirely private or entirely public,' it is protected so long as the 'main thrust' of the speech is on a matter of public concern." <u>Id.</u> (quoting <u>Morgan v. Ford</u>, 6 F.3d 750, 755 (11th Cir. 1993)).

Here, Plaintiff served as head of the Facilities Department for Gilmer County. He reported to Captain Henry and HR Director Buttram that Chastain carried a gun in an ankle strap in the Gilmer County courthouse, and that he kept another gun in his desk drawer, which he brandished to Plaintiff (multiple times) and three of Plaintiff's employees. (Complaint, Dkt. [1] ¶¶ 18-23, 26, 31.) Plaintiff also reported that Chastain threatened to shoot him on multiple

12

occasions.  Captain Henry referred the matter to Sheriff Stacy Nicholson, who in turn referred the report to GBI (i.e., Plaintiff was not responsible for escalation of the complaint; rather, it was done through Sheriff Office procedures).

Defendants argue that Plaintiff's communication with Captain Henry in March 2010 and his HR grievance filed in April 2010 were statements made as a public employee, not as a citizen, and the statements addressed a personal employment matter, not a matter of public concern.  Plaintiff contacted Captain Henry on March 2, 2010 to alert him that Plaintiff had hired an attorney to "advise [him] on how to proceed" regarding his issues with Chastain, and to alert Captain Henry that he may be hearing from Plaintiff's attorney to clarify certain facts.  (Pl.'s Depo., Dkt. [90] 98:21-99:3, 100:4-19, 102:3-6.)  Upon Captain Henry's request, Plaintiff provided Captain Henry with the statement he had prepared for his lawyer.  (Id. 99:3-7, 104:2-5.)

In his deposition, Plaintiff described his March 2, 2010 meeting with Captain Henry: "There was nothing being submitted to anybody anywhere.  It was strictly fact finding so that I would know how to proceed.  Because the County charter was very vague in support of anybody that had a problem with a commissioner."  (Id. 99:24-100:3.)  Captain Henry informed Plaintiff that he

would have to pass the report on to the Sheriff.  (Id. 104:22-25.)  Plaintiff

responded, "you do what you feel you need to do."  (Id. 105:4.)  Defendants

argue that Plaintiff's motivation for speaking with Captain Henry and his

indifference toward involving the Sheriff or others in his report indicate that

Plaintiff was speaking as an employee and not as a citizen, and that he was

speaking about a private employment issue, not a matter of public concern.

Defendants argue that the content of Plaintiff's written statement

(provided to Captain Henry and Ms. Alexander as the basis for his complaint

against Chastain) is particularly telling on the issue of whether Plaintiff was

speaking as a citizen on a public matter.  The statement describes an earlier

instance when Plaintiff reported his concerns about Chastain to Captain Henry,

after Chastain had threatened to shoot Plaintiff: "With everyone being related in

the area Captain Henry was the only one I really felt I could trust.  I informed

Captain Henry to take no action because I did not feel safe with the people

surrounding me. and [sic] that I just wanted to make the issue known."  ([75-1]

at 2.)  The statement notes that after the incident in December 2009 when

Chastain threatened Plaintiff with his gun, Plaintiff "refuse[d] to be in Marks

[sic] presence, and all my correspondence is via blackberry text messages or

emails."  ([75-1] at 3.)  The statement concludes:

14

> I do not feel that I can go to Diana, the HR officer, for
> she is Marks [sic] County Clerk and secretary for him
> as well.  According to the HR manual there is no other
> person above Mr. Chastain to plead my case with.  It
> is with much duress and conflict that I am presenting
> this case to my attorney, due to the very real
> possibility of losing my job, my life, and a possible
> end result of having to leave my home.  If this were an
> isolated case, or even if I felt I could hold out until
> 2011, I would.  However, the continued changing of
> Mr. Chastain's moods, with the increase of his threats,
> leaves me with no other choice.

Defendants maintain that the statement is nothing more than a de facto workplace grievance focused on Plaintiff's concern for *his* job, *his* safety, and possible litigation.

Similarly, Defendants argue, Plaintiff's HR grievance filed with Buttram in April 2010 is a statement made as an employee, not as a citizen, and concerns a personal employment matter, not an issue of public concern.  The grievance, after describing the incidents with Chastain, states:

> I feel that these instances are serious and life-
> threatening. . . . These instances are interfering with
> my job.  I am simply afraid to be alone with my
> supervisor.  I also fear for my staff and am concerned
> about retaliation.  Finally, they have caused me to be
> stressed and anxious.  Please let this letter serve as my
> formal complaint, submitted pursuant to the Gilmer
> County Human Resources Policies and Procedures
> Handbook.

15

Finally, Defendants argue that it was part of Plaintiff's duties to have knowledge of gun laws and regulations on courthouse property. (Gilmer MSJ, Dkt. [75-2] at 10.) Shortly after he became Chairman, Chastain asked Plaintiff to check with the Sheriff's Department to see if he was allowed to carry a gun in the courthouse. (Pl.'s Depo., Dkt. [90] 47:16-24.) Plaintiff did research the question for Chastain by speaking with Captain Henry. (Id. 48:8-10.) Additionally, Plaintiff was aware of signs restricting handguns in the courthouse. (Id. 49:7-9.)

Defendants also argue that Plaintiff, as an employee, had a general duty to protect the interests of his employer, the County. See Springer v. City of Atlanta, 2006 WL 2246188, at *3 (N.D. Ga. Aug. 4, 2006) ("Georgia law imposes on employees a duty of loyalty, faithful service and regard for an employer's interest.") (internal quotations omitted). Additionally, all employees of the County have a general obligation to promote a safe work environment. As acknowledged by Plaintiff, the County had in place "a policy requiring all employee's [sic] to comply with all 'federal, state, or local laws and regulations intended to promote a safe work environment.'" (Complaint, Dkt. [1] ¶ 45.) Therefore, Defendants argue, Plaintiff cannot maintain that his speech was divorced from his duties.

16

Plaintiff responds that he was speaking as a citizen, not as a public employee, when he reported Chastain to Captain Henry and the County's HR department.  (Pl.'s Resp. to Gilmer MSJ, Dkt. [95] at 7-13.)   He asserts that his statements "related to public safety and were made internally and externally," and therefore, Plaintiff "engaged in speech on a matter of public concern."  (Id. at 14.)  He claims that reporting security and public safety concerns at the Gilmer County Courthouse Annex was not part of his job duties, official or otherwise.  (Id. at 8.)  "Nor did [Plaintiff's] unofficial or extended duties include reporting that the Chair of the Board of Commissioners routinely brandished his weapon at employees and vendors in the Courthouse Annex."  (Id.)

Plaintiff highlights the fact that he reported Chastain to Captain Henry *first*, not to the County's HR department.  (Id. at 9.)  He notes that he had multiple conversations about Chastain with Captain Henry before and after their March 2, 2010 meeting.  (Pl.'s Depo., Dkt. [90] 45:16-21.)  Further, Plaintiff claims that he only described his complaints as "work related" because the incidents took place at work, and he did not believe his concerns arose out of his job or his duties because his duties did not include reporting public safety threats.  (Declaration of Dain R. Murphy, Dkt. [95-4] ¶ 13.)

17

The Court agrees with Defendants.  Plaintiff spoke as an employee, not as a citizen.  Plaintiff's reports are akin to employee grievances, concerned with his job performance and his personal safety in the workplace.  The manner in which he communicated his reports is also consistent with speech by an employee, not a citizen – through the County HR department via an established grievance process, to an attorney who was hired to help him navigate his work-related situation, and to Captain Henry, who was not asked by Plaintiff to act or respond in any way.  It matters not that reporting safety concerns was not part of Plaintiff's formal job description.  Clearly, Plaintiff's speech owed its existence to his professional responsibilities.

The Court also finds that Plaintiff's speech was related to his job and not a matter of public concern.  The primary purpose of Plaintiff's speech – both the Captain Henry report and the HR Grievance – was to protect his own interests, not to raise issues of public concern.  See Maggio v. Sipple, 211 F.3d 1346, 1352 (11th Cir. 2000) (the "relevant inquiry" is not whether the speech was on a topic that may interest the public, but whether the purpose of Plaintiff's speech was to raise issues of public concern or to further his own interests).  As Defendants note, the "main thrust" of Plaintiff's speech is concern for his own job and well-being.  Plaintiff did not attempt to involve the

18

public.  Instead, he went to Captain Henry, someone he saw regularly and casually through his job at the County, (Pl.'s Depo, Dkt. [90] 45:22-46:5), and the County's HR department, and did not attempt to take the matter any further. The involvement of the Sheriff and GBI was the result of actions taken by Captain Henry, not actions or encouragement by Plaintiff.  Plaintiff's passing references in his communications to the women on his staff and their concerns about Chastain do not turn his personal, employment-related grievance into a matter of public concern.

Finally, Plaintiff's speech is distinguishable in content and form from cases where courts have found that a public employee spoke as a citizen on a matter of public concern.  See, e.g., Barthlow, 2008 WL 1985405 (speech protected where county recording clerk filed allegations of election law violations by Clerk of Courts with Florida Elections Commission and Office of the State Attorney); Gresham, 2011 WL 4601020 (speech protected where Plaintiff posted on Facebook "newsfeed" allegations of unethical conduct within the police force).

In sum, the Court finds that Plaintiff was not speaking as a citizen on a matter of public concern.  Therefore, his speech is not protected under the First Amendment and the Court need not engage in further constitutional analysis.

19

Defendants' motions for summary judgment are **GRANTED** with regard to Plaintiff's First Amendment retaliation claim (Count I).

    B.    Remaining Counts

The remaining counts against Defendants are state-law claims.  Having granted Defendants' motions for summary judgment on the sole federal issue in this action, the Court declines to exercise jurisdiction over the remaining state-law claims.  Therefore, the remaining claims are **DISMISSED, without prejudice**, for lack of jurisdiction.

### Conclusion

Based on the foregoing, Defendants' Motion for Summary Judgment [75] and Defendants' Motion for Partial Summary Judgment [77] as to Plaintiff's First Amendment retaliation claim (Count I) are **GRANTED**, and the remaining state-law claims are **DISMISSED, without prejudice**, for lack of jurisdiction

    **SO ORDERED**, this __25th__ day of March, 2013.


RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

20